Case No. 22-11128

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CAROLYN NOLEN, WINDY KELLEY, CARA KELLEY, and PAULA LITTON, on behalf of themselves and all others similarly situated,

*Plaintiffs/Appellants*,

v.

FAIRSHARE VACATION OWNERS ASSOCIATION,
*Defendant/Appellee.*

Appeal from the United States District Court
for the Middle District of Florida
Civil Case No. 6:20-cv-00330 (Hon. Paul G. Byron)

## ANSWER BRIEF OF DEFENDANT/APPELLEE
## FAIRSHARE VACATION OWNERS ASSOCIATION

Joseph H. Lang, Jr.
Chris S. Coutroulis
D. Matthew Allen
Kevin P. McCoy
Nathaniel G. Foell
CARLTON FIELDS, P.A.
4221 W. Boy Scout Boulevard
Tampa, FL 33607-5780
Telephone: (813) 223-7000
Facsimile: (813) 229-4133

*Counsel for Defendant/Appellee Fairshare Vacation Owners Association*

*Nolen, et al. v. Fairshare Vacation Owners Association*,
No. 22-11128

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh

Circuit Rule 26.1-1, Defendant/Appellee, Fairshare Vacation Owners

Association, respectfully submits the following Certificate of Interested

Persons and Corporate Disclosure Statement:

1.    Allen, D. Matthew (Counsel for Appellee)

2.    Barron, Bradford D. (Counsel for Appellants)

3.    Barthle II, Patrick A. (Counsel for Appellants)

4.    Byron, Honorable Paul G. (United States District Judge for the Middle District of Florida

5.    Carlton Fields, P.A. (Counsel for Appellee)

6.    Coutroulis, Chris S. (Counsel for Appellee)

7.    Wright, David Robert (Counsel for Appellee)

8.    Fairshare Vacation Owners Association (Appellee)

9.    Fairshare Vacation Plan Use Management Trust (Fairshare Vacation Owners Association is the Trustee of the Fairshare Vacation Plan Use Management Trust)

10.    Foell, Nathaniel G. (Counsel for Appellee)

11.    Kelley, Cara (Appellant)

*Nolen, et al. v. Fairshare Vacation Owners Association*,
No. 22-11128

12.   Kelley, Windy (Appellant)

13.   Lang Jr., Joseph H. (Counsel for Appellee)

14.   Litton, Paula (Appellant)

15.   McCoy, Kevin P. (Counsel for Appellee)

16.   Methvin, Terrell, Yancey, Stephens & Miller, P.C. (Counsel for Appellants)

17.   Miller, Rodney E. (Counsel for Appellants)

18.   Morgan & Morgan Complex Litigation Group (Counsel for Appellants)

19.   Nolen, Carolyn (Appellant)

20.   Terrell, James M (Counsel for Appellants)

21.   Yanchunis, John A. (Counsel for Appellants)

Defendant/Appellee Fairshare Vacation Owners Association has no parent corporation. Fairshare Vacation Owners Association has not issued any stock. Therefore, no other organization owns 10 percent or more of its stock.

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.
(FBN 059404)

## STATEMENT REGARDING ORAL ARGUMENT

The district court's orders are thorough and well-reasoned. Fairshare Vacation Owners Association therefore does not believe that oral argument will be necessary to aid the decision-making process in this appeal, but would be pleased to participate in oral argument if that would be helpful to the Court.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS.............................................................ii

TABLE OF CITATIONS.........................................................vi

STATEMENT OF THE CASE ................................................ 1

    I.    Factual background ................................................ 1

    II.   Procedural background......................................... 4

         1.    Complaint..................................................... 4

         2.    Scheduling Order.......................................... 5

         3.    The parties' reliance upon the Scheduling Order......... 6

         4.    First Amended Complaint................................ 7

         5.    Second Amended Complaint ......................... 7

         6.    Class certification ......................................... 11

         7.    Summary Judgment ..................................... 11

SUMMARY OF ARGUMENT .................................................. 13

ARGUMENT ................................................................. 15

    I.    The district court correctly dismissed Counts 2–5 of the First Amended Complaint. .................................................. 15

         A.    Counts 2–4 were correctly dismissed. . ........................ 15

## TABLE OF CONTENTS
(continued)

**Page**

1. The Uniform Law Comment to Section 802
does not support Plaintiffs' position. ................ 21

2. The common law of trusts does not support
Plaintiffs' position. ............................................. 23

3. Other provisions of the Arkansas Trust Code
do not support Plaintiffs' position. ................... 27

4. An alternative ground exists for affirming
the district court's dismissal of Counts 2–4. .... 28

B. Count 5 was correctly dismissed. ............................... 28

II. The district court did not abuse its discretion in striking

Plaintiffs' Second Amended Complaint. ............................. 33

A. The district court did not abuse its discretion in

striking the Second Amended Complaint under its

inherent authority to manage its docket. ................. 33

B. Plaintiffs' citations to Rules 12(f) and 41 are

inapposite. ................................................................. 43

iii

## TABLE OF CONTENTS
(continued)

C.    The district court's *sua sponte* striking of the Second Amended Complaint was not an abuse of discretion. ..................................................................... 45

D.    Plaintiffs' argument that the district court erred in striking Count 5 of the Second Amended Complaint is meritless. ............................................... 47

III.    The district court correctly granted final summary judgment to Fairshare. ........................................................ 49

A.    The district court's summary judgment reasoning is sound. ........................................................................ 50

    1.    Management Agreement .................................... 52

    2.    Exemption from paying Program Fees ............. 54

    3.    Surplus Trust fund balance. ............................. 55

    4.    Excessive Program Fees. ................................... 56

B.    Plaintiffs' arguments focus on theories that the district court properly refused to consider and are meritless in any event. ............................................... 57

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ........................................................................ 63

CERTIFICATE OF COMPLIANCE ....................................... 65

CERTIFICATE OF SERVICE .............................................. 66

# TABLE OF CITATIONS

**Page(s)**

CASES

*Access Now Inc. v. Sw. Airlines Co.,*

    385 F.3d 1324 (11th Cir. 2004)..........................................................59–60

*Am. United Life Ins. Co. v. Martinez,*

    480 F.3d 1043 (11th Cir. 2007)............................................................45

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) .............................................................................30

*Augustus v. Bd. of Public Instruction of Escambia County,*

    306 F.2d 862 (5th Cir. 1962)................................................................43

*Bell Atl. Corp. v. Twombly,*

    550 U.S. 544 (2007) .............................................................................30

*Cave v. Singletary,*

    84 F.3d 1350 (11th Cir. 1996)........................................................33, 36

*Clement v. Larkey,*

    863 S.W.2d 580 (Ark. 1993)................................................................51

*Clinton v. Jones,*

    520 U.S. 681 (1997) .............................................................................34

## TABLE OF CITATIONS
(continued)

**Page(s)**

*Dietz v. Bouldin,*

579 U.S. 40 (2016) ................................................................. 34

*Embree v. Wyndham Worldwide Corp.,*

779 Fed. Appx. 658 (11th Cir. 2019) ........................................ 4, 40, 45

*Equity Lifestyle Properties, Inc. v. Florida Mowing and

Landscape Service, Inc.,*

556 F.3d 1232 (11th Cir. 2009) ................................................ 33–34, 35

*Fisher v. Boling,*

575 S.W.3d 592 (Ark. Ct. App. 2019) ................................................ 52

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.,*

377 F.3d 1164 (11th Cir. 2004) ................................................ 34

*Gilmour v. Gates, McDonald & Co.,*

382 F.3d 1312 (11th Cir. 2004) ................................................ 63

*Gratton v. Great Am. Comm'ns,*

178 F.3d 1373 (11th Cir. 1999) ................................................ 35

*Graves v. Mahoning Cty.,*

2011 WL 3703950 (N.D. Ohio Aug. 23, 2011) ................................ 42–43

## TABLE OF CITATIONS
(continued)

**Page(s)**

*Hambrick v. Farmers & Merchs. Bank, Stuttgart,*

    No. CA97-867, 1998 WL 84101 (Ark. App. 1998)......................... 23–24

*Helms v. Nationwide Ins. Co. of Am.,*

    280 F.R.D. 354 (S.D. Ohio 2012) ......................................................... 42

*Hill v. Allianz Life Ins. Co. of N. Am.,*

    2015 WL 12838838 (M.D. Fla. Jun. 17, 2015)................................... 42

*Hosey v. Burgess,*

    890 S.W.2d 262 (Ark. 1995) ............................................................... 51

*Jackson v. Bank of Am., N.A.,*

    898 F.3d 1348 (11th Cir. 2018)........................................................... 34

*Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.,*

    695 F.2d 524 (11th Cir. 1983).............................................................. 45

*Jennen v. Sipe,*

    2005 WL 1463437 (Ark. Ct. App. June 22, 2005) ...................55, 60–61

*Kuenzig v. Kraft Global Foods, Inc.,*

    2012 WL 366927 (M.D. Fla. Feb. 3, 2012) .................................... 33, 42

*Matter of GNB III Trust,*

    574 S.W.3d 159 (Ark. Ct. App. 2019) ................................................ 20

## TABLE OF CITATIONS
### (continued)

**Page(s)**

*MidAmerica C2L Inc. v. Siemens Energy Inc.,*

    25 F.4th 1312 (11th Cir. 2022) ............................................................ 39

\*Nebula Glass Intern., Inc. v. Reichhold, Inc.,

    454 F.3d 1203 (11th Cir. 2006)................................................. 36, 41, 59

*Oravec v. Sunny Isles Luxury Ventures, LLC,*

    527 F.3d 1218 (11th Cir. 2008)............................................................ 38

*Peterson v. Atlanta Hous. Auth.,*

    998 F.2d 904 (11th Cir. 1993)............................................................. 28

\*Pulliam v. Murphy,

    485 S.W.3d 711 (Ark. Ct. App. 2016) ...................................... 51, 53, 54

*Roenne v. Miller,*

    475 P.3d 708 (Kan. Ct. App. 2020)......................................... 24, 25, 27

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,*

    600 F.3d 1334 (11th Cir. 2010)............................................................ 31

*Smith v. School Bd. of Orange Cty.,*

    487 F.3d 1361 (11th Cir. 2007)...................................................... 38, 39

*Sosa v. Airprint Sys.,*

    133 F.3d 1417 (11th Cir. 1988)............................................................ 38

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Southern Grout & Mortars, Inc.*,

    575 F.3d 1235 (11th Cir. 2009)................................................................38

*Stardust, 3007 LLC v. City of Brookhaven*,

    899 F.3d 1164 (11th Cir. 2018)................................................................61

*Strickland v. Norfolk S. Ry. Co.*,

    692 F.3d 1151 (11th Cir. 2012)................................................................62

*Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*,

    815 F.2d 1435 (11th Cir. 1987) ..............................................................32

*\*The Cincinnati Ins. Co. v. Cochran*,

    2006 WL 4495335 (11th Cir. Dec. 27, 2006)..........................33, 41, 42

*United States v. McLean*,

    802 F.3d 1228 (11th Cir. 2015)........................................................36, 59

*Veritas Personnel Servs., Inc. v. ADP Totalsource, Inc.*,

    2019 WL 11506035 (S.D. Fla. Dec. 27, 2019) ......................................42

*Weiland v. Palm Beach Cty. Sheriff's Office*,

    792 F.3d 1313 (11th Cir. 2015) ......................................................34, 44

*Williams v. St. Vincent Infirmary Med. Ctr.*,

    615 S.W.3d 721 (Ark. 2021) ..........................................................20, 21

x

## TABLE OF CITATIONS
(continued)

**Page(s)**

**STATUTES**

Ark. Code § 28-73-105(b) ...................................................... 21, 27

Ark. Code § 28-73-106 ............................................................. 24

Ark. Code § 28-73-802 ...................................................... 21, 50

Ark. Code § 28-73-802(b) ............................................... *passim*

Ark. Code § 28-73-802(c) ............................................... *passim*

Ark. Code § 28-73-1003 .......................................................... 28

Ark. Code § 28-73-1003(a) ............................................... 28–29

**RULES**

Eleventh Circuit Rule 26.1-1 ................................................. C-1

Eleventh Circuit Rule 32-4 ...................................................... 65

Fed. R. App. P. 26.1 ............................................................... C-1

Fed. R. App. P. 32(a)(5) ........................................................... 65

Fed. R. App. P. 32(a)(6) ........................................................... 65

Fed. R. App. P. 32(a)(7)(B) ..................................................... 65

Fed. R. App. P. 32(f) ............................................................... 65

Fed. R. Civ. P. 12(b)(6) ........................................................... 44

Fed. R. Civ. P. 12(f) ................................................................. 43

## TABLE OF CITATIONS
(continued)

**Page(s)**

Fed. R. Civ. P. 15(a) ......................................................... 38, 45, 63

Fed. R. Civ. P. 41 ................................................................ 43, 44

**OTHER AUTHORITIES**

5C C. Wright, A. Miller, & R. Marcus,

*Fed. Prac. & Proc.* § 1382 .................................................. 43

Restatement (Second) of Trusts § 216 ................................... 24

Restatement (Third) of Trusts § 78 ....................................... 20, 23, 26, 54

## STATEMENT OF THE CASE[1]

## I.    Factual background

Wyndham Vacation Resorts, Inc. ("WVR") is the developer of resort communities and Vacation Plans with respect to which WVR sells timeshare interests. (Doc. 103 at ¶ 1). WVR, as the settlor of the Fairshare Vacation Plan Use Management Trust (the "Trust" or the "Plan"), established the Trust to "permit the Beneficiaries to use and exchange the Use Rights available through the Trust." (*Id.* at ¶ 2).

The Trust is governed by the Second Amended and Restated Fairshare Vacation Plan Use Management Trust Agreement (the "Trust Agreement"). (*Id.* at ¶ 3). Fairshare Vacation Owners Association ("Fairshare") is a nonprofit corporation that serves as Trustee of the Trust. (*Id.* at ¶ 4). Fairshare does not compensate itself for acting as the Trustee. (*Id.* at ¶ 35). And Fairshare does not compensate the individuals who sit on its Board of Directors. (*Id.* at ¶ 36). Fairshare could not fulfill its duties as Trustee without hiring WVR or another Plan Manager. (*Id.* at ¶ 53).

---

[1] References to the record are to the district court docket number and to the page numbers that appear in the header generated by the district court's electronic filing system, except where reference to a specific paragraph is possible.

The Trust and Management Agreements name WVR as the Plan Manager. (*Id.* at ¶ 17). The only agreement between Fairshare and any Wyndham entity is the Management Agreement between Fairshare and WVR. (*Id.* at ¶ 5).

Beneficiaries of the Trust include Members, Fairshare, the Plan Manager, and WVR. (*Id.* at ¶ 8). Members of the Trust include WVR and "holder[s] of a right to occupy an Accommodation as a consequence of such holder having his Property Interests (or the Use Rights therein) subjected to this Trust Agreement . . . ." (*Id.* at ¶ 9). The Fairshare Plus Assessment "consists of the sum of the Program Fee and the [Owners' Association] Fee . . . ." (*Id.* at ¶ 10).

The Program Fee is the fee "payable to the Trustee under Article X . . . by the Members for the expenses incurred in connection with the operation and administration of the Plan," the amount of which "is determined by the Trustee. . . ." (*Id.* at ¶ 11).

The Owners' Association ("OA") Fee is the "annual fee or fees due from each Member in respect of his Property Interest which fees shall be paid by the Member to, and held in escrow . . . by, the Trustee." The OA Fee "shall be equal to the sum of all annual amounts . . . that each . . .

Member agreed to pay the OA which governs the Property Interest which [the] Member used as the basis of his Membership," the amount of which is "determined by" the respective OAs, "not by the Trustee." (*Id.* at ¶ 12).

Section 6.02 of the Trust Agreement states that the Trustee may "delegate any or all of its duties . . . to the Plan Manager." (Doc. 45-1).

Section 6.03 of the Trust Agreement states that the "Management Agreement is incorporated [into the Trust Agreement] by reference and made a part [of the Trust Agreement] as though set forth word for word." (*Id.* at ¶ 15).

Section 9.02 of the Trust Agreement states that "[t]he Trustee . . . [is] relieved of any and all liability to any Beneficiary . . . from the Trustee . . . acting in accordance with the terms" of the Trust Agreement. (*Id.*). Pursuant to the Management Agreement, WVR, in its role as Plan Manager, has "all the powers and authority, and limitations thereon, which the Trustee has, pursuant to the Trust Agreement . . . ." (Doc. 103 at ¶ 52).

Section 14.07 of the Trust Agreement provides that Members, by assigning the use rights in their ownership interests to the Trust, paying the Program Fee, and otherwise accepting the benefits of the Trust, are

deemed to have agreed to be bound by the Trust Agreement and the Management Agreement. (*Id.* at ¶ 16).

Plaintiffs received copies of the Trust Agreement and the Management Agreement. (*Id.* at ¶ 29). Plaintiffs signed assignment agreements disclosing that WVR is Plan Manager of the Trust. (*Id.* at ¶ 30).

## II.    Procedural background

Years ago, these same plaintiffs' lawyers filed a lawsuit against WVR, additional, affiliated Wyndham companies, and Fairshare. In that case, a prior plaintiff challenged multiple aspects of Wyndham's timeshare business model, including its creation of a Trust governed by Fairshare. That lawsuit accused Fairshare of engaging in self-dealing by, among other things, entering into a management agreement with WVR. Judge Byron ruled that the second amended complaint, like its predecessors, was a shotgun pleading, and dismissed it with prejudice. This Court affirmed. *Embree v. Wyndham Worldwide Corp.*, 779 Fed. Appx. 658 (11th Cir. 2019).

### 1.    Complaint

The same plaintiffs' lawyers then filed this case, which was virtually identical to *Embree*, albeit involving different plaintiffs. Here,

Plaintiffs brought a class action alleging Fairshare breached its fiduciary duties to Beneficiaries of the Trust. (Doc. 45). Plaintiffs initially proceeded against multiple distinct entities in the Wyndham family but later dropped all Defendants except Fairshare in their operative First Amended Complaint. (Docs. 1, 45).

### 2.    Scheduling Order

On July 7, 2020, the district court entered its case management scheduling order. (Doc. 40). That order set a deadline of June 15, 2020, for motions to amend pleadings. (*Id*. at 1). Although that date had already passed by the time the case management order was entered, it had been agreed to by the parties in their case management report. (Doc. 33 at 2). The case management order established specific deadlines for the litigation to follow. The order admonished the parties:

> The parties are advised that the pendency of a dispositive motion, such as a motion to dismiss or for summary judgment[,] does not stay the deadline for completion of discovery. Parties who elect to forego discovery on the merits of any claim or defense due to the pendency of a dispositive motion or for any other reason, without leave of Court, will not be entitled to an extension of the deadlines set forth in this order.

(*Id*. at 2). This was the court's second warning to the parties to follow the scheduling order. In an order denying Defendants' motion to stay

discovery pending resolution of the motion to dismiss the initial Complaint, the court had cautioned that Rule 16 allows modification of the schedule "only for good cause and with the judge's consent," observing that the "good cause" standard is a "rigorous one, focusing not on the good faith of or the potential prejudice to any party, but rather on the parties' diligence in complying with the court's scheduling order." (Doc. 29 at 2) (citations omitted).

In an even-handed approach to the case, Judge Byron ruled that "repeated attacks" on Defendants' business model and their being "subjected to costly discovery" did not justify the "extraordinary measure of staying this litigation." *(Id.)*. On the other hand, while he required Defendants to go forward into costly discovery, Judge Byron also required Plaintiffs to stick with the horse they rode in on once that discovery was well underway.

### 3.    The parties' reliance upon the Scheduling Order

The parties relied on the scheduling order going forward, even as motion practice directed to the sufficiency of the complaint continued. The parties exchanged written discovery and Fairshare deposed Plaintiffs. Though Plaintiffs elected not to disclose experts on class certification, they moved for class certification. (Doc. 62).

Fairshare's damages expert, whose report was attached to Fairshare's class certification opposition, noted in his report that "Plaintiffs have not submitted a report quantifying Plaintiffs' damages or damages for the Proposed Class," but that he based his analysis on "claimed damages" in the First Amended Complaint. (Doc. 66-3 at 7).

### 4.   First Amended Complaint

Plaintiffs filed their First Amended Complaint, (Doc. 45), and Fairshare moved to dismiss it. The district court granted Fairshare's motion, in part, and dismissed Counts II–V of the First Amended Complaint, leaving only Counts I and VI in place. (Doc. 67). The court allowed Plaintiffs to "file a second amended complaint consistent with the directives of [the Order Dismissing Counts II–V of the First Amended Complaint]." *(Id.* at 12).

### 5.   Second Amended Complaint

Plaintiffs then filed a Second Amended Complaint. (Doc. 69). Rather than fixing the deficiencies in the First Amended Complaint as directed, Plaintiffs elected to devise a new theory of the case—several of them, in fact. No longer did Plaintiffs allege that Fairshare violated the Arkansas Trust Code by entering into the Management Agreement with

WVR and by entering into an agreement with WVR regarding WVR's provision and securitization of loans to Wyndham timeshare purchasers.

Instead, Plaintiffs newly alleged in Counts 2 and 3 of the Second Amended Complaint that Fairshare's by-laws mandate that, for any year in which the total amount of Program Fees will exceed the total amount it costs to administer the Plan, Fairshare's Board of Directors should cause the Members to vote at the annual meeting on whether to refund the excess or apply it to the following year's Program Fees. (Doc. 69 at ¶¶ 48–58; 59–68). Plaintiffs also newly alleged in Counts 4 and 5 that Fairshare violated the Arkansas Trust Code by reimbursing WVR for expenses related to marketing a VIP program. (*Id.* at ¶¶ 69–78, 79–99). A "third new theory," set forth in Counts 7 and 8, was that Fairshare violated the Arkansas Trust Code by failing to perform any "initial or ongoing analysis or due diligence" regarding the selection of WVR as Plan Manager, the amount of the management fee paid to WVR, and WVR's services and rates. (*Id.* at ¶¶ 100–106, 107–114).

Plaintiffs did not seek permission from the district court to file these new claims. Instead, on the same day they filed the Second Amended Complaint, Plaintiffs filed a motion to set a Rule 16 conference

"to address various case management issues and for an extension of the existing case management deadlines." (Doc. 70 at 1). At that time, the merits discovery deadline was only two months away. (Doc. 40 at 2).

On April 8, 2021, the district court held a hearing on Plaintiffs' motion to set a Rule 16 conference and extend the case management deadlines. (Doc. 75). On April 9, 2021, the court entered an order granting Plaintiffs' motion in part and striking the Second Amended Complaint. (Doc. 76 at 1). The court explained that its order on the motion to dismiss the First Amended Complaint had provided "clear guidance on the deficiencies" in that pleading, (*id.* at 4), but rather than fix those deficiencies, "Plaintiffs elected to devise a new theory of the case." (*Id.*)

The court further explained that during the 14 months since the case began, "the parties have engaged in extensive discovery and have retained expert witnesses on class certification, as well as on the merits." (*Id.* at 6–7). It observed that Plaintiffs already had moved for class certification, and Fairshare had responded. (*Id.*) Thus, "the parties prepared their respective cases based on the legal theories expressed in the [First] Amended Complaint." (*Id.* at 7). "Plaintiffs now want to scrap their theory of the case and replace it with three previously unpled

9

theories." (*Id.*) But "[i]f Plaintiffs can restart their case at this juncture, Defendant Fairshare will incur new discovery-related expenses, expert witness fees, and legal fees, thereby frustrating the purpose of the Court's scheduling order." (*Id.*)

Indeed, the court noted that "counsel for Fairshare advised the Court they had disclosed their expert on the issue of class certification as required by the original CMSO." (*Id.* at 7 n.4). If the Second Amended Complaint stood, "Fairshare's class certification expert would have to revise his report and opinions to meet the new theories." (*Id.*).

The court reiterated that its motion to dismiss order provided "specific guidance" to Plaintiffs on the defects in the First Amended Complaint and that its order permitted Plaintiffs to file a Second Amended Complaint "consistent with the directives of this Order." (*Id.* at 8 (citing Doc. 67 at 12)). But Plaintiffs "could not scrap their case and start over, which is what they are now attempting to do." (*Id.*) The court expressed an "exceptional reluctan[ce]" to take action that might deprive a party of the ability to have its case resolved on the merits. (*Id.*) "That said, the Court must be mindful of its duty to ensure cases progress in an orderly and cost-effective manner." (*Id.*) Allowing Plaintiffs to start over

10

after 14 months of litigation would force Fairshare to incur even more expenses, and would unnecessarily prolong the litigation. That in turn would frustrate the purpose of the case management scheduling order and "cannot be allowed." (*Id.*)

### 6.    Class certification

The court certified a class on July 12, 2022, after Fairshare filed a summary judgment motion but before briefing on that motion was completed.

In its class certification order, the court acknowledged Fairshare's argument that Plaintiffs were seeking class certification in part based on claims and theories that had been stricken, and made clear that it was "address[ing] only those claims that are actually pled in Plaintiffs' [First] Amended Complaint." (Doc. 95 at 4–5).

### 7.    Summary Judgment

The parties completed their briefing on Fairshare's motion for summary judgment. (*See* Docs. 94, 95, 96, 105, 109). On March 10, 2022, the district court granted Fairshare's motion. (Doc. 143). The court conducted a thorough analysis of Arkansas law (which it determined governed this dispute). It analyzed Plaintiffs' four theories of liability and the evidence that was properly before the court. *(Id.* at 10–21).

11

The court concluded that "Plaintiff[s] ha[ve] not put forward sufficient evidence that could demonstrate [Fairshare] was controlled by an affiliated entity or that any entity received an improper benefit as a result of the Management Agreement." (*Id.* at 14). The court also concluded that "Plaintiffs cannot explain away that the terms of the Trust expressly provide for WVR's role as Plan Manager." (*Id.* at 17).

The court rejected Plaintiffs' theory that WVR's exemption from paying Program Fees constitutes a breach of Fairshare's fiduciary duty. (*Id.* at 18). The court likewise determined that Plaintiffs' theories relating to surplus balances and excessive fees were unsupported by sufficient evidence. (*Id.* at 19–20).

In opposing summary judgment, Plaintiffs directly contravened the district court's prior directive by including arguments based upon the stricken claims and theories of liability. The district court interpreted its prior order to preclude these arguments. (*Id.* at 14 n.8; 19 n.11; 20 n.12).

## SUMMARY OF ARGUMENT

This class action dispute arises from the governance of a timeshare trust by Fairshare, the trustee. In particular, this is Plaintiffs' appeal of a final summary judgment in favor of Fairshare wherein the district court found no genuine dispute of material fact regarding whether Fairshare breached its fiduciary duties as Trustee. As will be seen below, however, Plaintiffs take the Court on a long detour before reaching their challenge to the summary judgment in their third argument on appeal.

Plaintiffs first challenge the district court's dismissal of Counts 2–5 of the First Amended Complaint. The court dismissed Counts 2–4 based on a straightforward reading of the relevant section of the Arkansas Trust Code, and it dismissed Count 5 because that claim was not supported by well-pleaded factual allegations. The court was correct.

Of course, the court offered Plaintiffs an opportunity to amend their allegations relating to the dismissed counts. Rather than accepting the court's generous but circumscribed offer, Plaintiffs shifted course entirely and, without seeking permission to do so, filed a Second Amended Complaint that injected entirely new claims and theories into the case. The court naturally rejected that effort by striking this improper pleading. Although Plaintiffs opted not to seek permission to take the

13

case in an entirely new direction before filing a pleading that attempted to do just that, they now attack the district court for exercising its broad discretion to address violations of its orders.

The case proceeded, therefore, on the remaining two counts of the First Amended Complaint. In granting summary judgment on those counts, the court thoroughly and correctly analyzed Arkansas law, from which it derived the legal framework it used to assess whether Plaintiffs' remaining claims were wanting as a matter of law. As a testament of sorts to the court's legal analysis, Plaintiffs do not challenge the legal framework the court adopted. Rather, Plaintiffs rest their argument for reversal of the summary judgment on the bold notion that the court should have considered evidence constituting the very claims and theories that the court struck. This Court should follow the district court in rejecting Plaintiffs' transparent attempt at summary judgment to introduce stricken new claims and theories indirectly in circumvention of the district court's clear ruling that they could not do so directly.

## ARGUMENT

### I.  The district court correctly dismissed Counts 2–5 of the First Amended Complaint.

#### A.    Counts 2–4 were correctly dismissed.

In Counts 2–4 of the First Amended Complaint, Plaintiffs claim that Fairshare violated Section 802 of the Arkansas Trust Code by entering into the Management Agreement with WVR (Count 2), by granting WVR the "exclusive right" to provide financing for Wyndham timeshare purchases (Count 3), and by "allow[ing]" WVR to securitize the loans it provides to Wyndham timeshare purchasers (Count 4). (Doc. 45 at ¶¶ 49, 61, 71).

Section 802 of the Arkansas Trust Code contains a number of provisions related to a trustee's duty of loyalty. Subsections 802(b) and 802(c) are the pertinent provisions because they concern potential conflict-of-interest transactions entered into by a trustee, and in each of Counts 2–4 Plaintiffs claim that Fairshare entered into a "transaction affected by a conflict of interest." (*Id.* at ¶¶ 47, 59, 69).

Subsections 802(b) and 802(c) provide as follows:

(b) Subject to the rights of persons dealing with or assisting the trustee as provided in § 28-73-1012, a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's

15

own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:

> (1) the transaction was authorized by the terms of the trust;
>
> (2) the transaction was approved by a court;
>
> (3) the beneficiary did not commence a judicial proceeding within the time allowed by § 28-73-1005;
>
> (4) the beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with § 28-73-1009; or
>
> (5) the transaction involves a contract entered into or claim acquired by the trustee before the person became or contemplated becoming trustee.

(c) A sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with:

> (1) the trustee's spouse;
>
> (2) the trustee's descendants, siblings, parents, or their spouses;
>
> (3) an agent or attorney of the trustee; or
>
> (4) a corporation or other person or enterprise in which the trustee, or a person who owns a significant interest in the trustee, has an interest that might affect the trustee's best judgment.

Ark. Code § 28-73-802(b)–(c).

Subsection 802(c) complements subsection 802(b). Subsection 802(b) provides that an action taken by a trustee can be voided by an affected beneficiary when four criteria are satisfied: (1) the action was a "sale, encumbrance, or other transaction;" (2) it "involve[d] the investment or management of trust property;" (3) it was "entered into by the trustee for the trustee's own personal account" or was "otherwise affected by a conflict between the trustee's fiduciary and personal interests;" and (4) it was not authorized by the terms of the trust, consented to by the affected beneficiary, or any of several other conditions not relevant here. Ark. Code § 28-73-802(b). Subsection 802(c), in turn, addresses a question left unanswered by subsection 802(b): when is a transaction that was not "entered into by the trustee for the trustee's own personal account" nonetheless "affected by a conflict between the trustee's fiduciary and personal interests?" Subsection 802(c) provides the partial but still helpful answer that such a conflict is presumed when a trustee enters into a transaction with any of the people or entities specified in subsections 802(c)(1)–(4).

Plaintiffs claim that Fairshare violated Section 802 by entering into conflict-of-interest transactions with WVR regarding management of the

Trust (Count 2), financing of Wyndham timeshare purchases (Count 3), and securitization of the loans made by WVR to Wyndham timeshare purchasers (Count 4). (Doc. 45 at ¶¶ 49, 61, 71). Plaintiffs allege it must be presumed that these transactions were affected by a conflict between Fairshare's fiduciary and personal interests because, they allege, Fairshare and WVR are affiliates and, they contend, subsection 802(c)(4) provides that transactions between affiliates are subject to that presumption. (Doc. 45 at ¶¶ 53, 63, 74).

But transactions subject to the presumption of a conflict of interest are still not voidable by an affected beneficiary when any of the conditions specified in subsections 802(b)(1)–(5) was met. Among these conditions is that a conflict-of-interest transaction is not voidable when it was authorized by the terms of the trust or consented to by the affected beneficiary. Ark. Code § 28-73-802(b)(1), (b)(4).

The district court dismissed Counts 2–4 because Plaintiffs failed to plead that none of the conditions specified in subsections 802(b)(1)–(5) was met with respect to the transactions alleged in those counts. (Doc. 67 at 7). They thus failed to plead that those transactions are voidable.

18

Plaintiffs argue that they have stated claims in Counts 2–4 because in each of those counts they allege a "violation" of § 802(c), and they do not need to "allege a violation of § 802(b) as well." (Init. Br. at 28–32). But, as the plain language of Section 802 makes clear, there is no such thing as a violation of subsection 802(c). Section 802 provides in subsection (b) that certain conflict-of-interest transactions by a trustee can be voided by an affected beneficiary, and it provides in subsection (c) that a conflict of interest will be presumed in certain circumstances. Subsection 802(c) thus complements subsection 802(b), it does not create a freestanding prohibition on conflict-of-interest transactions that functions separate and apart from subsection 802(b). Put differently, Plaintiffs are incorrect that voiding a "conflicted transaction is an available remedy under both subsections" 802(b) and 802(c). (Init. Br. at 31). Rather, as the district court explained, subsection 802(b) "provides the remedy available to beneficiaries affected by" a conflict-of-interest transaction, while subsection 802(c) provides "the exclusive list" of circumstances "in which a conflict of interest is presumed." (Doc. 67 at 5).

Plaintiffs' view of the relationship between subsections 802(b) and 802(c) has several serious flaws. One is that Plaintiffs do not cite a single

19

case from Arkansas or any of the other 35 states that have adopted the Uniform Trust Code that supports their view.[2] *See Matter of GNB III Trust*, 574 S.W.3d 159, 163 (Ark. Ct. App. 2019) ("In 2005, Arkansas adopted a version of the Uniform Trust Code . . ., retitled as the Arkansas Trust Code . . . ."). Another is that Plaintiffs make no effort to show how their view of the relationship between subsections 802(b) and 802(c) can be reconciled with the plain language of those provisions. The truth is that their novel view contravenes the plain language of those provisions, as explained in the immediately preceding paragraphs, which is reason enough to reject that view. *See Williams v. St. Vincent Infirmary Med. Ctr.*, 615 S.W.3d 721, 727 (Ark. 2021) ("[I]f the language of the statute is plain and unambiguous, the analysis need go no further.").

Despite those flaws in Plaintiffs' view of the relationship between subsections 802(b) and 802(c), Plaintiffs attempt to support their view by pointing to three sets of materials: (1) the Uniform Law Comment to Section 802; (2) the common law of trusts, including a comment to Restatement (Third) of Trusts Section 78; and (3) other provisions of the

---

[2] For a list of the 36 states, which was compiled by the Uniform Law Commission, *see* https://tinyurl.com/bdezdcxs.

Arkansas Trust Code, namely subsections 105(b) and 814(a). Even if each of these supported Plaintiffs' view, that would not be enough to overcome the fact that their view contravenes the plain language of subsections 802(b) and 802(c). *See Williams*, 615 S.W.3d at 727. In fact, none supports Plaintiffs' view.

> **1.    The Uniform Law Comment to Section 802 does not support Plaintiffs' position.**

As noted above, Plaintiffs contend that voiding a "conflicted transaction is an available remedy under both subsections" 802(b) and 802(c). (Init. Br. at 31). Plaintiffs attempt to support that contention by pointing to the portions of the Uniform Law Comment to Section 802 stating that subsection (b) makes "transactions involving trust property entered into by a trustee for the trustee's own personal account voidable without further proof" because "[s]uch transactions are irrebuttably presumed to be affected by a conflict between personal and fiduciary interests," while subsection (c) makes a transaction between a trustee and certain third parties "presumptively voidable." Ark. Code § 28-73-802 cmt. But Plaintiffs misconstrue those statements.

When the Uniform Law Comment to Section 802 describes trustee transactions as "presumptively voidable" or "voidable without further

proof," it is speaking to whether further proof is needed that the transaction is in fact a conflict-of-interest transaction. It is in no way saying there are conflict-of-interest transactions that are voidable by an affected beneficiary even if the terms of the trust authorize that transaction, or the affected beneficiary consented to it, or one of the other conditions enumerated in subsections 802(b)(1)–(5) was satisfied, much less that subsection 802(c) creates some special category of such transactions.

Indeed, in a portion of the Uniform Law Comment to Section 802 that Plaintiffs ignore, it goes on to make clear that "no breach of the duty of loyalty occurs" if one of the conditions enumerated in subsections 802(b)(1)–(5) was satisfied, including if "the transaction was authorized by the terms of the trust" or an affected beneficiary "has consented" to it. (*Id.*). Note that this portion of the Uniform Law Comment to Section 802 does not say that no violation of subsection 802(b) occurs if one of the conditions enumerated in subsections 802(b)(1)–(5) was satisfied, it says that "no breach of the duty of loyalty occurs," a broader statement that supports Fairshare's view that subsections 802(b) and 802(c) are not separate prohibitions on conflict-of-interest transactions that function

22

independent of one another. Rather, together those provisions form a single rule regulating conflict-of-interest transactions and thereby effectuating the duty of loyalty.

Adopting Plaintiffs' view of the relationship between subsections 802(b) and 802(c) would have the strange consequence that transactions irrebuttably presumed to be affected by a conflict of interest are not voidable if authorized by the terms of the trust or consented to by the affected beneficiary, whereas transactions merely presumed to be affected by a conflict of interest are, unless the conflict is rebutted, voidable even with authorization and/or consent. The Uniform Law Comment to Section 802 supports no such strangeness.

### 2. The common law of trusts does not support Plaintiffs' position.

Plaintiffs argue that the common law of trusts supports their position regarding the relationship between subsections 802(b) and 802(c), citing a Kansas case and a comment to Restatement (Third) of Trusts Section 78. (Init. Br. at 33–37). Of course, the common law of trusts, including in Arkansas, recognized that "[t]he duty of the trustee is to administer the trust according to the provisions thereof. . . ." *Hambrick v. Farmers & Merchants Bank, Stuttgart*, 1998 WL 84101, at

23

*4 (Ark. Ct. App. Feb. 25, 1998). It also recognized that "generally speaking, a beneficiary cannot hold a trustee liable for an act if the beneficiary, prior to or at the time of the act, consented to it." (*Id.* at *5 (citing Restatement (Second) of Trusts § 216 (1959))).

Moreover, to the extent the common law of trusts placed limits on what a settlor could authorize a trustee to do in the terms of the trust agreement—or limits on what a trustee could do even with beneficiary consent—the Arkansas Trust Code is clear that when the Code's provisions conflict with the common law of trusts, the Code's provisions prevail. Ark. Code § 28-73-106.

Even if the common law of trusts placed limits on what a settlor could authorize a trustee to do in the terms of the trust agreement—or limits on what a trustee could do even with beneficiary consent—and even if those limits should be read into the Arkansas Trust Code despite the plain language of subsections 802(b)(1) and 802(b)(4), those limits are not implicated in this case. Examining the Kansas case and Restatement comment that Plaintiffs cite shows as much.

In *Roenne v. Miller*, the trustee—who was also a beneficiary of the trust—"used the trust income for his own purposes and then transferred

24

all the assets to himself." 475 P.3d 708, 713 (Kan. Ct. App. 2020). The court observed that this "drastic action of conveying all the trust assets to oneself and nothing to the other four beneficiaries violates the duties of loyalty and impartiality *unless authorized by an express provision of the trust.*" (*Id.* at 717 (emphasis added)). The trustee argued that doing so was authorized by a provision of the trust granting him "uncontrolled discretion." (*Id.* at 714). The court rejected this argument, holding that a broad grant of absolute discretion to a trustee does not authorize the trustee to ignore every other term of the trust and thereby to "act as if there is no trust at all." (*Id.* at 711).

Plaintiffs' First Amended Complaint does not plausibly allege that Fairshare has acted "as if there is no trust at all," and Fairshare has never defended itself by arguing that it has absolute discretion to do anything it pleases. Rather, Fairshare has defended itself by arguing, for example, that the Trust Agreement specifically authorizes WVR to serve as Plan Manager. (Doc. 52 at 4 (citing Doc. 27-24 § 6.03)). Unlike a broad grant of absolute discretion, such a specific term is "an express provision of the trust" that authorized Fairshare to enter into the Management Agreement with WVR. *Roenne*, 475 P.3d at 713.

25

The Restatement (Third) of Trusts likewise recognizes this distinction. Plaintiffs quote a portion of a comment to Section 78 stating that "no matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly." Restatement (Third) of Trusts § 78 cmt c(2). But the comment goes on to state, in a portion of it Plaintiffs do not quote or otherwise acknowledge, that "even the statement . . . about not allowing a trustee to act 'unfairly' requires a recognition that, in this context, fairness itself depends on trust provisions and purposes and on benefits the settlor may have intended to confer on the trustee personally, either as a designated beneficiary or as inferred from the terms of the self-dealing authorization." (*Id.*). "For example," the comment continues, "the authorization may allow the trustee to purchase certain trust property at a stated or formula price that amounts to a beneficial (i.e., potentially favorable) option price. Such a purchase would not be 'unfair' even though for less than a fair-market consideration." (*Id.*).

26

### 3. Other provisions of the Arkansas Trust Code do not support Plaintiffs' position.

Plaintiffs argue that even when a conflict-of-interest transaction was authorized by the terms of the trust, consented to by an affected beneficiary, or satisfied one of the other conditions enumerated in subsections 802(b)(1)–(5), "an examination of the fairness and good faith" of the transaction is still mandated by subsections 105(b) and 814(a) of the Arkansas Trust Code. (Init. Br. at 33). Subsection 105(b) provides that the terms of a trust cannot eliminate all constraints on a trustee's actions, and subsection 814(a) provides that this is true even when a trust agreement grants "absolute," "sole," or "uncontrolled" discretion to a trustee. (Init. Br. at 32–33 (quoting the pertinent parts of these two provisions)). Those provisions are not implicated in this case because the Trust Agreement contains no grant of "uncontrolled" discretion to Fairshare and, as explained above, Fairshare has never taken the position that the Trust Agreement authorizes it to do anything it pleases. Those provisions also are not inconsistent with *Roenne* and the Restatement's shared recognition that specific terms of a trust authorizing a trustee to take particular actions are to be given effect.

27

### 4. An alternative ground exists for affirming the district court's dismissal of Counts 2–4.

Even if the court's dismissal of Counts 2–4 was in some way erroneous, this Court has said that it is "not disposed to reverse and remand" a ruling "where there would be no difference in result." *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 913 (11th Cir. 1993). That is the case here. Counts 2–4 all depend on the allegation that Fairshare and WVR are "affiliated entities" and so transactions between them are "presumed to be affected by a conflict of interest." (Doc. 45 ¶¶ 53 (Count 2), 63 (Count 3), 74 (Count 4)). But Fairshare established at summary judgment that Fairshare and WVR are not affiliates, (Doc. 94 at 16-17 & n.4), and Plaintiffs did not respond to that argument, (Doc. 109 at 7). It would thus be futile to permit Plaintiffs to pursue the claims in Counts 2–4.

### B. Count 5 was correctly dismissed.

In Count 5 of the First Amended Complaint, Plaintiffs claim that Fairshare violated Section 1003 of the Arkansas Trust Code by profiting from its governance of the Trust. (Doc. 45 at ¶¶ 76–82). Section 1003 of the Arkansas Trust Code states, in pertinent part, that a "trustee is accountable to an affected beneficiary for any profit made by the trustee

28

arising from the administration of the trust, even absent a breach of trust." Ark. Code § 28-73-1003(a).

The core of Count 5 is its allegation that Fairshare has accumulated a "positive" or "surplus" Trust fund balance. (Doc. 45 at ¶ 79). The court dismissed Count 5 because that allegation is not sufficient to state a claim that Fairshare profited from its governance of the Trust. (Doc. 67 at 7–8). The court explained that "a 'positive trust fund balance' by itself does not amount to profit to Defendant." (*Id.* at 8 (quoting Doc. 45 at ¶ 79)).

Plaintiffs argue that the court erred because revenues exceeding expenses—in other words, a positive account or fund balance—is the "legal definition of profit." (Init. Br. at 39). But this argument commits Plaintiffs to the absurd position that any non-profit entity, like Fairshare, could plausibly be accused of unlawfully profiting solely on the basis that its revenues exceed its expenses. The court correctly declined to adopt that position.

The allegation that Fairshare has accumulated a positive Trust fund balance simply does not state a claim that Fairshare has profited from its governance of the Trust. The mere existence of a positive trust

29

fund balance does not "plausibly suggest[]" that the trustee treats said balance as its own rather than as property of the trust, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), and Plaintiffs do not cite a single case where a court has said otherwise. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

Plaintiffs also argue that the district court failed to credit their allegations that Fairshare charged "excessive fees" and "held these funds for its own use." (Init. Br. at 39). But because both of those supposed allegations are conclusory assertions rather than genuine allegations, neither is entitled to be treated as true. *See Iqbal*, 556 U.S. at 679. As the court explained, each of those assertions is "fact-free." (Doc. 67 at 8; *see also id.* ("[T]he Amended Complaint is completely devoid of any factual allegations to support the conclusory statement that the 'surplus trust fund balance is currently held by Defendant exclusively for its own use.'") (quoting Doc. 45 at ¶ 79)).

Even if the assertion that Fairshare holds a positive Trust fund balance "exclusively for its own use" were a genuine allegation (Doc. 45 ¶ 79), it still should be disregarded in the dismissal analysis because it contradicts the Trust Agreement, an extrinsic document properly considered at the dismissal stage. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337–38 (11th Cir. 2010) (rejecting an allegation contradicted by an extrinsic document properly considered at the dismissal stage). The Trust Agreement makes clear that Fairshare is a non-profit entity that has no rights in or derived from Trust property. (Doc. 27-24 at 1, § 6.01(a), § 10.02, § 10.03). Plaintiffs have never meaningfully disputed that point, nor have they alleged that Fairshare has misappropriated a single dollar of Trust money by spending it for something other than Trust purposes.[3]

Further, there is an alternate basis on which this Court could affirm the district court's dismissal of Count 5, which is that Plaintiffs abandoned this claim in their response to Fairshare's motion to dismiss

---

[3] The Trust Agreement is one of several transaction documents Plaintiffs signed or acknowledged when they purchased their Wyndham timeshare interests. Fairshare attached these transaction documents to its motion to dismiss the initial Complaint and incorporated them by reference into its motion to dismiss the First Amended Complaint.

the First Amended Complaint. In the First Amended Complaint, Plaintiffs claim that Fairshare profited from its governance of the Trust, (Doc. 45 at ¶¶ 76–82), while in their response to Fairshare's motion to dismiss that pleading, Plaintiffs claim instead that WVR profited from services it performed for the Trust. (Doc. 49 at 14–16). Fairshare highlighted this discrepancy in the reply in support of its dismissal motion. (Doc. 52 at 6).

Now, on appeal, Plaintiffs attempt to revert to the claim that Fairshare unlawfully profited. (Init. Br. at 37–39). But Plaintiffs are barred from pursuing that claim on appeal because they did not try to defend it before the district court. To be sure, Plaintiffs did include a two-sentence footnote (including the citation sentence) in their response to Fairshare's motion to dismiss stating that "Fairshare has profited from the Trust." (Doc. 49 at 14 n.4). But this perfunctory footnote is not nearly sufficient to preserve that claim. *See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) (finding that a "single footnote . . . did not sufficiently preserve" an issue).

32

II.  **The district court did not abuse its discretion in striking Plaintiffs' Second Amended Complaint.**

A.  **The district court did not abuse its discretion in striking the Second Amended Complaint under its inherent authority to manage its docket.**

Plaintiffs first argue that the district court abused its discretion in striking the Second Amended Complaint because the court "failed to identify under what Federal Rule of Civil Procedure or other authority it was operating." (Init. Br. at 39). Not so. In the section of its order entitled "Legal Principles," the court cited *Cave v. Singletary*, 84 F.3d 1350 (11th Cir. 1996), *The Cincinnati Ins. Co. v. Cochran*, 2006 WL 4495335 (11th Cir. Dec. 27, 2006), and *Kuenzig v. Kraft Global Foods, Inc.*, 2012 WL 366927 (M.D. Fla. Feb. 3, 2012), for the propositions that the court's interpretation of its own orders "is accorded due deference on appeal" and that it "may strike" an amended complaint that "disregards the scope of the [c]ourt's grant of leave to amend." (Doc. 76 at 6). Thus, the court provided ample basis for its authority to strike the Second Amended Complaint.

The court correctly understood the law in this area. In multiple cases, both the Supreme Court and this Court have declared that a district court has "inherent authority to manage and control its own

docket so as to achieve the orderly and expeditious disposition of cases." *Equity Lifestyle Properties, Inc. v. Florida Mowing and Landscape Service, Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009); *see also Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("This Court has also held that district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The [d]istrict [c]ourt has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 n.7 (11th Cir. 2004).

This inherent authority includes the power to strike or dismiss claims that do not comply with prior orders. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015) (district court retains "inherent authority to control its own docket and ensure the prompt resolution of lawsuits," including, under proper circumstances, "the power to dismiss a complaint for failure to comply with Rule 8(a)(2)"); *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018) (same).

Moreover, whether to dismiss a complaint (or here, strike it) for failure to comply with an order of the court is a matter committed to the district court's discretion. *Equity Lifestyle*, 556 F.3d at 1240 n.14; *Gratton v. Great Am. Comm'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). Pursuant to the "great deference" shown a court's interpretation of its own order, this Court will vacate such a decision only if the challenging party shows that the court made a "clear error of judgment." *McClean*, 802 F.3d at 1233.

Significantly, Plaintiffs have not even attempted to satisfy this heightened standard. They do not argue that they followed the district court's explicit direction in framing the Second Amended Complaint. As the court noted in its order striking that pleading, its earlier dismissal order provided "clear guidance on the deficiencies in the [First] Amended Complaint." (Doc. 76 at 4). The dismissal order also stated that Plaintiffs could file a Second Amended Complaint "consistent with the directives of this Order, if they believe they can do so in accordance with Rule 11." (*Id.* (quoting Doc. 67 at 12)).

But Plaintiffs did not fix the First Amended Complaint's deficiencies in the Second Amended Complaint, a point they cannot

contest in this Court because the Second Amended Complaint abandoned the claims that the district court deemed deficient. Instead, as set forth in the Statement of the Case above, Plaintiffs sought to bring entirely new claims and theories of liability without having obtained permission to do so.

The attempted injection of these new claims and theories into the case unquestionably violated the "specific guidance" the court provided Plaintiffs on how to amend the First Amended Complaint. (*Id.* at 8). It also ignored the court's instruction to "submit a Second Amended Complaint consistent with the directives of this Order." (*Id.* (citation and internal quotation marks omitted)).

The district court reasonably interpreted its prior order to mean that "Plaintiffs could not scrap their case and start over, which is what they are now attempting to do." (*Id.*). Under the abuse of discretion standard, this Court is "obliged to . . . accord [the district court's] interpretation deference so long as it is reasonable." *Nebula Glass Intern., Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1211–12 (11th Cir. 2006) (citing *Cave*, 84 F.3d at 1354–55); *see also United States v. McLean*, 802 F.3d 1228, 1233 (11th Cir. 2015).

Plaintiffs do not argue that the court's interpretation of its prior order was unreasonable. This failure to apply the correct legal standard alone requires affirmance. *See United States v. Frazier*, 387 F.2d 1244, 1259 (11th Cir. 2004) (*en banc*) (an abuse of discretion standard of review differs from a de novo standard in that the former allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment").

Plaintiffs could not succeed in that argument even if they tried. Plaintiffs agreed in the parties' case management report that the deadline for amending the complaint—and thereby adding new claims or theories of liability—would be June 20, 2020, a date long since passed when Plaintiffs filed the Second Amended Complaint. (Doc. 33 at 2). The court incorporated this date into the case management scheduling order. (Doc. 40 at 1). Thus, Plaintiffs well understood that they had to litigate the case going forward on the theories of liability already alleged, not new theories. The fact that the district court rejected some of Plaintiffs' existing theories in its dismissal order did not give them license to disregard the deadline for amendment set by the scheduling order. As the court noted, it "established deadlines to ensure the efficient management

37

of this case." (Doc. 76 at 6). Plaintiffs were not entitled to disregard those deadlines.

To be sure, after receiving the dismissal order, Plaintiffs could have filed a motion seeking permission to bring their new claims in the Second Amended Complaint. Because the deadline for doing so had passed, they would have had to present good cause for that relief. *Smith v. School Bd. of Orange Cty.*, 487 F.3d 1361, 1367 (11th Cir. 2007) (citing Fed. R. Civ. P. 15(a)). And to show good cause, Plaintiffs would have had to demonstrate that they had acted diligently in pursuing their claims. *See Sosa v. Airprint Sys.*, 133 F.3d 1417, 1419 (11th Cir. 1988) (affirming denial of motion to amend complaint because plaintiff's failure to comply with court's scheduling order resulted from lack of diligence); *Southern Grout & Mortars, Inc.*, 575 F.3d 1235, 1242 & n.3 (11th Cir. 2009) (same). Perhaps they made the strategic decision not to go this route because they knew that "[i]f a party was not diligent, the good cause inquiry should end." *Oravec v. Sunny Isles Luxury Ventures, LLC*, 527 F.3d 1218, 1232 (11th Cir. 2008).

Plaintiffs obliquely suggest that they did not have full knowledge of the facts giving rise to their new theories at the time they filed the First

Amended Complaint. (Init. Br. at 22). This Court has rejected similar arguments for good cause even when a plaintiff, unlike here, filed a motion for leave to amend.

In *Smith*, for example, the plaintiff sought leave to amend his complaint after the deadline for amendment had passed because, in his view, discovery had produced evidence of "new violations of the law that must be addressed within the counts of the complaint." 487 F.3d at 1367. The district court denied that motion because the plaintiff failed to explain why the facts underlying the amendment were undiscoverable previously. (*Id.*). This Court affirmed, noting the "extreme untimeliness of [the plaintiff's] motion and his lack of a complete showing of good cause." (*Id.*). *See also MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1336 (11th Cir. 2022).

Although Plaintiffs filed a motion for Rule 16 conference and extension of deadlines on the same day they filed their Second Amended Complaint, even there they did not attempt to show good cause for raising new claims and theories. Their supposed discovery of new evidence does not excuse their litigation strategy of filing the new claims in the Second Amended Complaint without seeking permission.

The district court was entitled to have its orders followed. It did not abuse its discretion in declining to look the other way regarding Plaintiffs' refusal to follow the court's direction in its dismissal order.

Also, the court's interpretation of its dismissal order was reasonable given the posture of the litigation at the time of the partial dismissal of the First Amended Complaint. As Plaintiffs themselves note, this case is not the first challenge their lawyers have made to the Wyndham timeshare system. Plaintiffs' counsel knew full well from the *Embree* case what their theories of liability would be and whether those theories had any evidentiary support. Additionally, although Plaintiffs now complain that they had to move through this case without "any substantive guidance from the Court as to its view of the claims," (Init. Br. at 10), right out of the gate they opposed a motion to stay discovery pending resolution of the motion to dismiss the initial Complaint, (Doc. 28 at 14), a motion the court denied, (Doc. 29). In its order denying Defendants' motion to stay, the court provided fair warning to both sides that its scheduling order would be modified only on good cause. (Doc. 29 at 2).

40

The fact that Plaintiffs wanted to change horses midstream after the court expressed skepticism in its dismissal order regarding the theories pleaded in the First Amended Complaint does not change that directive. Both the scheduling order and the dismissal order required Plaintiffs to remain astride the horse they rode in on.

Striking the Second Amended Complaint was not a clear error in judgment. By the time the district court did that, this litigation had already spanned two cases, six complaints, and five years. (Doc. 29 at 2). To have allowed Plaintiffs to start over with new legal theories after 14 months of litigation in this case alone would have forced Fairshare to "incur even more expenses" and unnecessarily prolonged this litigation. (Doc. 76 at 8).

Notably, Plaintiffs do not argue that the district court's dismissal order was ambiguous. And even if they had made such an argument, in *Nebula* this Court declared that "identifying a potential ambiguity does not render the district court's construction of its own order unreasonable." 454 F.3d at 1212.

*Cincinnati Insurance,* although unpublished, is on-point and therefore highly persuasive. There, the district court had granted

defendants/counterplaintiffs "limited leave to amend" a counterclaim to "clarify the specific nature of their allegations." The counterplaintiffs, without permission, added a malicious prosecution counterclaim that was "outside the scope of the order." The district court struck that counterclaim because its order "did not contemplate the addition of parties" or the addition of claims. This Court affirmed because the district court was "well within its discretion when it struck the malicious prosecution counterclaim on the basis that it exceeded the scope of the original order." 2006 WL 449535, at *3.

*Cincinnati Insurance* does not stand alone. Numerous other courts have refused to permit plaintiffs to add new claims and theories of liability that exceeded the scope of a district court's grant of leave to amend. *See Hill v. Allianz Life Ins. Co. of N. Am.*, 2015 WL 12838838 (M.D. Fla. Jun. 17, 2015); *Kuenzig*, 2012 WL 366927; *Veritas Personnel Servs., Inc. v. ADP Totalsource, Inc.*, 2019 WL 11506035 (S.D. Fla. Dec. 27, 2019); *Helms v. Nationwide Ins. Co. of Am.*, 280 F.R.D. 354, 359–62 (S.D. Ohio 2012). When the court limits the scope of permissible amendment, plaintiffs are not free to file "whatever amendment they

42

s[ee] fit." *Graves v. Mahoning Cty.*, 2011 WL 3703950, at *4 (N.D. Ohio Aug. 23, 2011).

## B.    Plaintiffs' citations to Rules 12(f) and 41 are inapposite.

Plaintiffs also argue that Rules 12(f) and 41 do not permit the district court to strike the Second Amended Complaint. (Init. Br. at 30–36). This is a straw man for the simple reason that the court did not ground its decision on those rules. Unlike the cases cited at pages 31 through 33 of the Initial Brief, this case does not involve the striking of redundant, immaterial, impertinent, or scandalous matter from a complaint pursuant to Rule 12(f).[4] Nor does it involve Rule 41 sanctions, making Plaintiffs' citation of sanctions cases on pages 33 through 34 of their brief irrelevant.

Plaintiffs argue from their Rule 12(f) and Rule 41 cases that the court abused its discretion because dismissal with prejudice is an extreme sanction that is appropriate only when a party engages in a clear pattern of delay or willful contempt and the court specifically finds that a lesser sanction would not suffice. First, this case is unlike those cases

---

[4] The Wright & Miller treatise grounds Plaintiffs' principal case, *Augustus v. Bd. of Public Instruction of Escambia County, Fla.*, 306 F.2d 862, 868 (5th Cir. 1962), in Rule 12(f). *See* 5C C. Wright, A. Miller, & R. Marcus, *Fed. Prac. & Proc.* § 1382.

43

because here the district court did not dismiss with prejudice, it permitted Plaintiffs to go forward on the viable claims they alleged in the First Amended Complaint. Second, this Court repeatedly has rejected similar arguments in similar contexts.

*Weiland* is illustrative. There, the Court addressed the district court's authority to dismiss a shotgun pleading even though the district court's order did not cite the authority the court relied on to dismiss the pleading. This Court assumed the court was not acting under Rule 41(b) because the order did not make the findings necessary to justify a dismissal under that provision. It further assumed the dismissal was not based on Rule 12 because the court believed the plaintiffs could state claims for relief. Although the Court reversed because the complaint was not a shotgun pleading, it upheld the court's inherent authority to dismiss claims, even with "Rule 41(b) and Rule 12(b)(6) off the table." It reasoned that the "dismissal . . . was based on the district court's inherent authority to control its docket and ensure the prompt resolution of lawsuits, which in some circumstances includes the power to dismiss a complaint for failure to comply with Rule 8(a) and Rule 10(b)." *Weiland*, 792 F.3d at 1320.

44

**C.  The district court's *sua sponte* striking of the Second Amended Complaint was not an abuse of discretion.**

The fact that the court struck the Second Amended Complaint *sua sponte* also is of no moment. This Court prohibits *sua sponte* dismissals when (1) the defendant has not answered the complaint and the plaintiff still has the right to amend under Rule 15(a), (2) the plaintiff has brought his claim in good faith, and (3) the district court has failed to give the plaintiff notice of an intent to dismiss or an opportunity to respond. *See Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.*, 695 F.2d 524 (11th Cir. 1983). This prohibition does not apply, however, where plaintiffs already have availed themselves of their right to file an amended complaint and the district court has given plaintiffs an opportunity to cure defects in that amended complaint. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1069–70 (11th Cir. 2007) (holding that in these circumstances, the "case does not fall within the purview of those cases condemning *sua sponte* dismissals").

Here, Plaintiffs already had filed two complaints before the Second Amended Complaint (not counting the three complaints filed in *Embree*). They also had been given the opportunity to cure the defects in the First Amended Complaint but failed to do so, instead electing to shift course,

45

defy the court's "clear" direction in its dismissal order, and bring new claims and theories.

Moreover, before entering its order, the court held a hearing and gave Plaintiffs' counsel an opportunity to argue that Plaintiffs' new claims and theories should not be stricken. (Doc. 75). Although Plaintiffs claim to have been blindsided by this issue, it should not have been a surprise to them. On March 15, 2021, in its opposition to class certification, Fairshare already had objected to the injection of the new claims and theories into the case. (Doc. 66). Thus, Plaintiffs' assertion that they had no "opportunity to be heard" on the court's intention to strike the Second Amended Complaint (Init. Br. at 17) is meritless.

Indeed, Plaintiffs were not prejudiced by the *sua sponte* striking of the Second Amended Complaint. If the district court had denied Fairshare's motion to dismiss the First Amended Complaint, Plaintiffs would have had no vehicle to attempt to shoehorn in their new claims and theories. They would have been required to litigate the case under the claims and theories pleaded in the First Amended Complaint. The fact that the court granted Fairshare's motion in part but allowed

Plaintiffs an opportunity to fix the deficient claims, which Plaintiffs failed to do, afforded Plaintiffs no license to add new claims and theories.

### D. Plaintiffs' argument that the district court erred in striking Count 5 of the Second Amended Complaint is meritless.

Plaintiffs also specifically challenge the court's striking of Count 5 of the Second Amended Complaint as "incorrect based on the district court's own order that permitted the amendment in the first place." (Init. Br. at 46). They argue that Count 5 was not a new theory because it and Count 2 of the First Amended Complaint were "based on the same legal theory, namely that Fairshare violated § 802(c) by entering into a management agreement with an affiliated entity." (*Id.* at 47). They insist that the new "factual allegations explaining how Fairshare's payment of certain marketing expenses was not authorized by the terms of the Trust" were merely "additional allegations" that responded to the court's criticism that in Counts 2–4 Plaintiffs must "allege the elements which include the conditions set forth in Subsection 802(b)." (*Id*).

The district court concluded that Count 5, like the other counts in the Second Amended Complaint, exceeded the leave to amend that Plaintiffs had been granted in the court's dismissal order. Although Plaintiffs argue that as to Count 5 the court's interpretation of its

47

dismissal order was "incorrect" (Init. Br. at 46), they do not argue that its interpretation was unreasonable, as they must to obtain reversal. In fact, the court's interpretation of its dismissal order was neither incorrect nor unreasonable.

Count 2 of the First Amended Complaint and Count 5 of the Second Amended Complaint were significantly different claims. As discussed above, the gravamen of Count 2 was that Fairshare violated Section 802 of the Arkansas Trust Code by "entering into a management agreement for the management of Trust Properties with its affiliate WVR." (Doc. 45 ¶ 49). The remaining relevant paragraphs of Count 2 merely contain additional description of the Management Agreement in light of which, Plaintiffs contend, entering that Agreement was a prohibited conflict-of-interest transaction. (*Id.* ¶¶ 50–53).

Nowhere did Count 2 allege that Fairshare violated Section 802 by paying certain marketing expenses of WVR, which was the gravamen of Count 5. And although Count 5 alleges the existence of the Management Agreement, it does not allege—unlike Count 2—that merely entering this Agreement was a prohibited conflict-of-interest transaction. Rather, Count 5 alleges, unlike Count 2, that Fairshare violated the Arkansas

Trust Code by "agreeing to pay WVR's VIP marketing costs," which was "not authorized by the terms of the trust." (Doc. 69 ¶¶ 84–86).

The court's conclusion that Count 5 of the Second Amended Complaint was a new claim based on a new theory of liability, not a refinement of Count 2 of the First Amended Complaint, was not unreasonable.[5]

## III. The district court correctly granted final summary judgment to Fairshare.

The district court thoroughly analyzed the record and correctly determined that summary judgment was appropriate. Plaintiffs tacitly acknowledge the strength of the court's analysis by spilling precious little ink in contesting it. Rather, Plaintiffs candidly admit that the only purported errors they raise are "inextricably" linked to their first two points in this appeal. That is, in seeking to establish error in the summary judgment order, Plaintiffs focus on barred claims and theories

---

[5] Plaintiffs offer a glancing suggestion that the court should not have stricken Counts 1 and 9 "in total" because those counts reasserted claims the district court had just upheld. (Init. Br. at 46, 48). They do not explain, however, why this was unreasonable given that the court permitted Plaintiffs to proceed on the same declaratory relief and fiduciary duty claims set forth in the First Amended Complaint.

that the court refused to consider based on its prior directive to Plaintiffs, not on the analysis the court actually conducted.

Plaintiffs avoid the court's actual analysis with good reason. Plaintiffs provided no expert testimony, no affidavits, and no deposition testimony other than their own unsupported allegations in opposing summary judgment. And Plaintiffs did not cite a single case where a trustee was held liable for common law breach of fiduciary duty when the trustee acted in a manner that was authorized by the terms of the trust or consented to by the beneficiaries.

## A.    The district court's summary judgment reasoning is sound.

The district court set forth a comprehensive analysis of the governing Arkansas law in resolving the summary judgment motion. In particular, it explained in detail that the actual terms of the trust agreement must be respected and applied in resolving Plaintiffs' claims. The court set forth the following framework for its analysis.

"After the passage of the Arkansas Trust Code, an Arkansas court harmonized the statutory self-dealing provision, Arkansas Trust Code § 28-73-802, and past Arkansas case law regarding trustee self-dealing:"

[Section 802(a) of the Arkansas Trust Code] provides that a trustee shall administer the trust solely in the interests of the beneficiaries. [Section 802(b)] provides that a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction *unless, among other things, the transaction was authorized by the terms of the trust.*

It is permissible for one of several trustees or a sole trustee also to be one of several beneficiaries of a trust, even though conflicts of interest and coincidental benefits to that trustee-beneficiary result. *Clement v. Larkey*, 863 S.W.2d 580, 582 (Ark. 1993). The fact of a coincidental benefit to a trustee is not alone sufficient to establish a breach of fiduciary duty on the part of the trustee. *Id.* The general rule is that a trustee, in administering a trust, is under the duty of acting exclusively and solely in the interest of the trust estate or the beneficiaries *within the terms of the trust* and is not to act in his own interest by taking part in any transaction concerning the trust where he has an interest adverse to that of the beneficiary. *Hosey v. Burgess*, 890 S.W.2d 262, 265 (Ark. 1995).

(Doc. 143 at 12 (quoting *Pulliam v. Murphy*, 485 S.W.3d 711, 715 (Ark. Ct. App. 2016) (emphasis added))).

The court also explained that, "[t]o determine the terms of the trust," "[an Arkansas court] construing a trust applies the same rules applicable to the construction of a will, and the paramount principle in the interpretation of wills is that the intention of the testator, or trust

settlor, governs." "When the purpose of a trust is ascertained, that purpose will take precedence over all other canons of construction." *(Id.* at 12–13 (quoting *Fisher v. Boling,* 575 S.W.3d 592, 594 (Ark. Ct. App. 2019) (internal citations omitted))). In challenging the summary judgment on appeal, Plaintiffs do not contest this framework.

With this framework in place, the court then turned to addressing Plaintiffs' surviving theories of liability, all of which allege that Fairshare violated its fiduciary duty.[6] *(Id.* at 13).

### 1.    Management Agreement

The court thoroughly analyzed and rejected Plaintiffs' claim that Fairshare breached its fiduciary duties by entering into the Management Agreement with WVR.

In reaching its conclusion, the court explained why Plaintiffs are incorrect that "a common law claim for breach of a fiduciary duty is not constrained by the terms of a written agreement or subject to the application of the Arkansas Trust Code." *(Id.* at 14). Specifically,

---

[6] The court noted that Plaintiffs conceded that they do not have evidence to pursue their pleaded theory that Fairshare impermissibly allowed an affiliated entity to finance, securitize, and service loans involving the Trust property. (Doc. 143 at n.6 (citing Doc. 105 at 19–20)).

"Arkansas case law confirms that the Arkansas Trust Code's duty of loyalty provision, Section 802, and the common law of trusts work in tandem: a trustee may engage in transactions that would otherwise present impermissible conflicts of interest when they are 'authorized by the terms of the trust.' " *(Id.* at 14–15 (quoting *Pulliam*, 485 S.W.3d at 715 (quoting Ark. Code § 28-73-802(b))).

Similarly, the court rejected Plaintiffs' theory that fiduciary obligations cannot be extinguished by contract in these circumstances, where the governing trust document speaks directly to the issue. "But the principles governing trusts and those governing contracts are not the same. The paramount principle in the interpretation of trusts is that the intention of the trust settlor governs." *(Id.* at 15). The court also expressly rejected Plaintiffs' argument that the issue of consent precluded summary judgment. *(Id.* at 16–17). Plaintiffs do not take issue with any of the court's foregoing analysis in challenging the summary judgment on appeal.

To the extent Plaintiffs attempt to raise an argument that the court omitted an analysis of "fairness," (Init. Br. at 52 n.30), such an argument is unpreserved and meritless because (i) it is mentioned in only a footnote

53

and is not developed, which is insufficient to preserve an issue on appeal; (ii) Plaintiffs offer no indication that any Arkansas court has adopted the comment to the Restatement (Third) of Trusts § 78 that they cite; (iii) Plaintiffs did not plead this theory; (iv) Plaintiffs did not argue this theory in opposition to Fairshare's motion for summary judgment; and (v) Plaintiffs have no evidence to support this theory.

Having set forth the legal framework applicable to the Management Agreement theory of liability, the court then applied it to that theory. While acknowledging that there are some outer limits to the ability of a trust agreement to "wholly extinguish" fiduciary duties, the court concluded that such limits are not implicated by the facts here. (Doc. 143 at 17 (citing *Pulliam*, 485 S.W.3d at 715)).

### 2.     Exemption from paying program fees.

The court also rejected Plaintiffs' theory that WVR's exemption from paying Program Fees is a breach of Fairshare's fiduciary duties. The court observed that this very exemption is actually provided for in the Trust Agreement. (Doc. 143 at 18). That being so, Fairshare could not charge WVR the Program Fee without contravening the terms of the Trust Agreement and thereby disregarding its obligation to govern the

54

Trust according to its terms. In challenging the summary judgment on appeal, Plaintiffs raise no issue regarding this exemption from paying Program Fees.

### 3.    Surplus Trust fund balance

Next, the court correctly rejected Plaintiffs' theory that Fairshare violated its fiduciary duties by "failing to return any surplus" Trust fund balance to the Beneficiaries. The court determined that the facts, including the simple existence of "several raw end-of-year surplus Trust fund balances," "are insufficient as a matter of law to support Plaintiffs' claim." *(Id.* at 18–19). The court explained its reasoning as follows:

> [T]he Court has already noted that, "'a positive fund balance' by itself does not amount to profit to [Fairshare]." (Doc. 67, p. 8). And the allegation that [Fairshare] retains this balance for its own use or the use of WVR and other Wyndham subsidiaries was "fact free." (*Id.*). This is true because citing to the raw Trust balance itself tells the Court nothing about whether [Fairshare] has gone too far. *Cf. Jennen v. Sipe,* No. CA04-1342, 2005 WL 1463437, at *2–3 (Ark. Ct. App. June 22, 2005) (finding a plaintiff failed to introduce evidence demonstrating the standard of care in the relevant industry in affirming a trial court's directed verdict).

*(Id.* at 19). Of course, even on appeal Plaintiffs still do not identify any "analysis showing when the retention of the Trust's surplus would become excessive or allegations supported by specific facts tending to

show that [Fairshare] used the Trust balance for its own or its related entities' benefit." (*Id.*).

### 4.    Excessive Program Fees

Finally, the court correctly rejected Plaintiffs' theory that Fairshare charged excessive Program Fees. As with their challenge to the surplus Trust fund balances, Plaintiffs offered only raw numbers in opposing the summary judgment motion. The court appropriately declined to treat those raw numbers, which had no evidentiary context, as support for Plaintiffs' naked assertions of excessiveness. "[T]he raw numbers tell the Court nothing about when the Program Fees or payments to related entities become excessive, and Plaintiffs provide the Court no evidence— no industry standards, no accounting analyses, no financial calculations—to fill in this gap with regards to *any* of the supposedly suspect payments." (*Id.* at 20). In challenging the summary judgment order on appeal, Plaintiffs do not contest the court's conclusion that they presented "no industry standards, no accounting analyses, [and] no financial calculations" to support their theory of excessiveness.[7]

---

[7] Plaintiffs state in a footnote that they would use publicly available SEC filings at trial to establish excessiveness. (Init. Br. at 53 n.31). Plaintiffs did not make this argument in opposition to the summary judgment motion in the district court. It should thus be deemed abandoned, and

Likewise, the court wisely refused "to treat smoke as fire" when Plaintiffs argued that Fairshare's work with Wyndham-connected entities to calculate the Program budget and the related Program Fees supported their excessiveness theory. "That is, the Court will not credit the potential for self-dealing created by WVR's role as Plan Manager as evidence of actual self-dealing when this role (and thus the job of calculating the Program Fees) was expressly set out in the terms of the Trust Agreement." *(Id.* at 20–21).

## B.    Plaintiffs' arguments focus on theories that the district court properly refused to consider and are meritless in any event.

Given that Plaintiffs do not contest or even acknowledge the district court's foregoing reasoning for granting summary judgment, what is the basis of their challenge to the summary judgment? Curiously, Plaintiffs fault the court for refusing to consider claims and theories they offered in opposition to summary judgment in direct contravention of the court's

---

rejected for that reason alone. Moreover, their attempt to raise an issue on appeal through a footnote in their brief without any further development of the issue should be rejected as well. Notwithstanding those two serious preservation problems, Plaintiffs also fail to warrant their assumption that comparative profit among competitors is relevant to any theory of liability. In fact, there is no reason to assume that this mystery evidence makes any sort of apples-to-apples comparison.

earlier orders instructing them not to pursue those claims and theories. Plaintiffs essentially ask this Court to reward their defiance.

When the court struck the Second Amended Complaint, it directed Plaintiffs not to pursue their new claims and theories, which included new claims and theories relating to due diligence and to Fairshare's by-laws. Despite the district court's directive, Plaintiffs raised those very barred claims and theories in opposition to the motion for summary judgment. Unsurprisingly, the court refused to consider claims and theories that were raised in direct violation of its orders. *(Id.* at 14 n.8, 19 n.11, 20 n.12).

Now, on appeal, Plaintiffs argue that the court erred in refusing to consider those claims and theories. Of course, Plaintiffs apparently realized the need to plead these new claims and theories and therefore included the new claims and theories in their proposed Second Amended Complaint. After the court disallowed that Second Amended Complaint, however, their implicit new assertion on appeal is that their effort to amend their complaint was actually unnecessary, as they assert that the evidence constituting their new claims and theories can be used in support of their prior (and now-operative) complaint. That is an exercise

in semantic gamesmanship and directly contrary to the district court's rulings.

Further, Plaintiffs did not seek leave to present evidence in support of their disallowed claims and theories and did not ask the court to exercise its discretion to interpret its prior orders to allow Plaintiffs' attempts to offer evidence of the same claims and theories that the court told them not to pursue. The district court should be afforded much deference in the interpretation of its prior orders. *See Nebula Glass*, 454 F.3d at 1211; *McLean*, 802 F.3d at 1233.

Plaintiffs also did not argue to the district court that it was required to consider the evidence constituting their barred claims and theories for other purposes, much less present the court with the authorities they cite on appeal. Indeed, they cited none of the "precedent and policy" that they now argue "dictate[s]" that their "evidence must be considered." (Init. Br. at 57–64). Instead, they simply charged ahead and attempted to oppose summary judgment with arguments based upon disallowed claims and theories in defiance of the court's prior orders.

This Court generally does not consider issues raised for the first time on appeal as these issues are not properly preserved for review. *See*

*Access Now Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (collecting cases). Rather, this Court has explained that, "as a court of appeals, we review claims of judicial error in the trial courts," and "[i]f we were to regularly address questions . . . that district[ ] court[s] never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court." *Id.* at 1331. In fact, it would be unduly prejudicial to Fairshare to allow Plaintiffs to challenge the summary judgment based upon claims and theories that the district court unequivocally removed from the case and that Plaintiffs did not argue to the district court should be considered for other purposes.

In any event, Plaintiffs' disallowed theory of due diligence fails for other reasons, as well. Plaintiffs offered no expert testimony or other evidence regarding the standard of care Fairshare must follow. Plaintiffs speculated that Fairshare should have done more due diligence when approving budgets, but they have no knowledge and presented no evidence of the standard of care in the timeshare industry. *See Jennen*, 2005 WL 1463437, at *2 (affirming a directed verdict for the defendants

60

in a negligence suit because the plaintiff "failed to introduce any evidence of a standard of care that was breached.").

Plaintiffs also failed to offer evidence for their assertion that Fairshare charged excessive fees. Simply put, Plaintiffs failed to come forward with evidence regarding the purported unreasonableness of the fees. Plaintiffs have not presented evidence that other timeshare systems charge their internal exchange program members lower fees. They also failed to present evidence that any of the line items in a budget approved by Fairshare reflect inflated expenses, reveal improper accounting, or are otherwise unreasonable. And there is nothing in the record indicating that Fairshare has misused the funds collected in any way. In short, Plaintiffs offer mere speculation of wrongdoing relating to the fees Fairshare has charged, unadorned by any facts. But "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018) (citation omitted).

It remains only to note that the authorities Plaintiffs cite for the first time on appeal to support their challenge of the summary judgment

are inapposite. In particular, Plaintiffs cite a series of cases for the general proposition that the district court must consider all evidence in the record when deciding a motion for summary judgment. *See, e.g.*, *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

None of these cases addresses a situation where the court expressly ruled that the claims and theories at issue were unavailable or barred, as the district court here ruled. These cases do nothing to endorse defiance of prior court orders.

If Plaintiffs were correct, their Second Amended Complaint was altogether unnecessary. In reality, they affirmatively sought to change their claims and theories of the case in their proposed Second Amended Complaint. That is unsurprising, as the terms "due diligence" and "by-laws" do not appear even once in the operative complaint. Thus, while Plaintiffs maintain that "newly acquired evidence" should be considered at summary judgment when it "falls within the scope" of an "existing claim, about which the defendant is on pleading notice" (Init. Br. at 57), they never explain how the evidence constituting the new claims and theories in the Second Amended Complaint can be said to fall within the scope of the claims in the First Amended Complaint when the First

Amended Complaint contains not one word about those claims and theories.

In this respect, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), and its progeny are instructive. This Court has recognized the following:

> At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.

*Id.*

Here, Plaintiffs actually did try to amend their complaint to expressly plead and add their new claims and theories and the district court rejected that attempt. Thus, the *Gilmour* reasoning applies with even more force in these circumstances. None of the cases Plaintiffs cite authorizes the use of such precluded claims and theories in opposition to summary judgment in contravention of earlier orders of the court.

## CONCLUSION

The final judgment should be affirmed.

63

September 6, 2022

Respectfully submitted,

**CARLTON FIELDS, P.A.**

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr. (FBN 059404)
Chris S. Coutroulis (FBN 300705)
D. Matthew Allen (FBN 866326)
Kevin P. McCoy (FBN 036225)
Nathaniel G. Foell (FBN 1010475)
4221 W. Boy Scout Boulevard
Tampa, FL 33607-5780
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
Primary Email: jlang@carltonfields.com
Primary Email: ccoutroulis@carltonfields.com
Primary Email: mallen@carltonfields.com
Primary Email: kmccoy@carltonfields.com
Primary Email: nfoell@carltonfields.com
Secondary Email: kathompson@carltonfields.com

*Attorneys for Appellee Fairshare Vacation Owners Association*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies that this Answer Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this document contains 12,969 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Eleventh Circuit Rule 32-4. The undersigned attorney also certifies that this Answer Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Answer Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with Century Schoolbook 14-point font.

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.
(FBN 059404)

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 6th day of September, 2022, I caused the foregoing Answer Brief to be electronically filed using the Court's CM/ECF System, thereby serving all registered users in this case by operation of that electronic filing system.

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.
(FBN 059404)

66